**GIRARD SHARP LLP**
Dena C. Sharp (SBN 245869)
Adam E. Polk (SBN 273000)
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Email: dsharp@girardsharp.com
Email: apolk@girardsharp.com

Andy D. Birchfield, Jr. (*pro hac vice*)*
Jennifer K. Emmel (*pro hac vice*)*
Joseph G. VanZandt (*pro hac vice*)*
Clinton Richardson (*pro hac vice*)*
Seth Harding (*pro hac vice*)*
**BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC**
234 Commerce Street
Montgomery, AL 36103
Tel:  334-269-2343
Email: Andy.Birchfield@BeasleyAllen.com
Email: Joseph.VanZandt@BeasleyAllen.com
Email: Clinton.Richardson@BeasleyAllen.com
Email: Seth.Harding@BeasleyAllen.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| AUTUMN SEEKFORD<br><br>                     Plaintiff,<br>        v.<br><br>META PLATFORMS, INC., FACEBOOK HOLDINGS, LLC, FACEBOOK OPERATIONS, LLC, FACEBOOK PAYMENTS, INC., FACEBOOK TECHNOLOGIES, LLC, INSTAGRAM, LLC, & SICULUS, INC.,<br><br>                     Defendants. | Case No.<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

1

**TABLE OF CONTENTS**

2

I.    INTRODUCTION ...................................................................................................1

3

II.   JURISDICTION AND VENUE ...........................................................................5

4

III.  PARTIES ..............................................................................................................6

5

IV.   GENERAL FACTUAL ALLEGATIONS.............................................................7

6

     A.    Teenagers Are Particularly Vulnerable to the Perils of Excessive
7
          Social Media Use. ......................................................................................7

8

     B.    Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain...............14

9

     C.    Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold
          Defendants Liable as the Publisher or Speaker of Any Content
10
          Provided, Posted, or Created by Third Parties.................................................19

11

V.    PLAINTIFF-SPECIFIC ALLEGATIONS .................................................20

12

VI.   CAUSES OF ACTION.....................................................................................21

13

VII.  TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS .....................74

14

VIII. DEMAND FOR A JURY TRIAL.....................................................................74

15

IX.   PRAYER FOR RELIEF ...................................................................................74

16

17

18

19

20

21

22

23

24

25

26

27

28

i

## I.    INTRODUCTION

1.    Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.    This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta

subsidiary, current or former, is responsible for specific conduct is knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3.     Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4.     Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and

COMPLAINT
Case No.

1    excessive use that they know threatens the actuation of addictive and self-destructive behavioral

2    patterns.

3        5.      Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com

4    ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most

5    popular social networking products, with more than two billion combined users worldwide. It is

6    estimated that nine out of ten teens use social media platforms, with the average teen using the

7    platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain

8    and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that

9    we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a

10   generation of children physiologically entrapped by products the effects of which collectively result

11   in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

12       6.      As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus

13   reaching 59% of the world's social networking population, the only social media platform to reach

14   over half of all social media users. Instagram has become the most popular photo sharing social

15   media platform amongst teenagers and young adults in the United States, with over 57 million users

16   below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

17       7.      A user's "feed" on both Facebook and Instagram is comprised of an endless series of

18   photos, videos, text captions, and comments posted by accounts that the user follows, along with

19   advertising and content specifically selected and promoted by Instagram and Facebook.

20       8.      Instagram also features a "discover" page where a user is shown an endless feed of

21   content that is selected by an algorithm designed by Instagram based upon the users' data profile:

22   demographics, prior activity in the platform, and other data points. Meta has added similar features

23   to Facebook on the apps "menu" and "watch" sections.

24       9.      Over the past decade or so, Meta has added features and promoted the use of auto-

25   playing short videos and temporary posts on Facebook and Instagram, with the former being referred

26   to as "Reels" while the latter is referred to as Instagram "Stories."

27

28

COMPLAINT
Case No.

10.     Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11.     Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12.     Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13.     Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14.     The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users, especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users,

COMPLAINT
Case No.

Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.   JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.    This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of California and purposely avail themselves of the benefits of transacting business with California residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of California and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.    Defendants interface with a significant percentage of the population of the State of California relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of California.

18.    Defendants advertise extensively in California, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in California for whom those devices are intended.

19.     Defendants have earned millions of dollars in annual revenue from their California-related activities over the last several years arising from the use of their defective and inherently dangerous social media products by California residents.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Meta resides in the Northern District of California and, upon information and belief, all Defendants are residents of the State of California.

### III.   PARTIES

**Plaintiff**

21.     Plaintiff Autumn Seekford is an adult individual residing in Front Royal, Virginia.

**Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**Subsidiary Defendants**

24.     Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

COMPLAINT
Case No.

25.     Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

26.     Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

28.     Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.   GENERAL FACTUAL ALLEGATIONS

### A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

30.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive

decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31.     Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32.     The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical psychological harm through their social media use

than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33. Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34. Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

COMPLAINT
Case No.

35.    One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.    Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37.    Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

      a.      Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

      b.      Tolerance, the need to spend more time using social media to satisfy the urge.

      c.      Inability to reduce social media usages, unsuccessful attempts to quit gaming.

      d.      Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

      e.      Continuing to use social media despite problems.

   f. Deceiving family members or others about the amount of time spent on social media.

   g. The use of social media to relieve negative moods, such as guilt or hopelessness; and

   h. Jeopardizing school or work performance or relationships due to social media usage.

38. Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39. Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40. Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

COMPLAINT
Case No.

activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020),
https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

COMPLAINT
Case No.

1  features that make the platforms highly addictive include the use of intermittent variable rewards

2  ("IVR") and its Facial Recognition System ("FRS").

3      42.   IVR is a method used to addict a user to an activity by spacing out dopamine triggering

4  stimuli with dopamine gaps—a method that allows for anticipation and craving to develop and

5  strengthens the addiction with each payout. The easiest way to understand this term is by imagining

6  a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable

7  reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone

8  has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or

9  shared either of your posts. As explained below, Meta spaces out notifications of likes and comments

10  into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the

11  platforms' addictiveness.

12      43.   Engineered to meet the evolving demands of the "attention economy,"[5] a term used to

13  describe the supply and demand of a person's attention, which is a highly valuable commodity for

14  internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its

15  "Like" button; Instagram launched that same year and came ready-made with a like function shaped

16  as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments,

17  posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays

18  notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These

19  designs take advantage of users' dopamine-driven desire for social validation and optimizes the

20  balance of negative and positive feedback signals to addict users.

21      44.   Other psychological manipulations used to intertwine social media users include, but

22  are not limited to: (1) the FRS system, which has already collected for distribution to various third-

23  parties a billion individual facial recognition templates and is otherwise used by Meta to identify and

24  tag people in photos;  (2) Meta's use of wavy dots to reflect that someone is currently writing you a

25  message, which is designed to keep you on the platform until you receive the message or shorten the

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

1    time for you to return and check for a message; and (3) the concept of social reciprocity, a variance

2    of quid pro quo, pursuant to which Meta alerts you when someone has read your message, which

3    encourages the receivers to respond—because the sender knows the message has been read—and

4    simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum,

5    this perilous amalgamation of intense psychological vulnerability and targeted exploitation

6    foreseeably results in an increased risk of a variety of harms for today's youth, including, but not

7    limited to, social media addiction, withdrawal—from friends, family, and social and academic

8    advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating

9    disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain,

10   self-harm, and suicide among other harms.

11   **B.     Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

12         45.     Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in

13   2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under

14   which commercial web sites that either target children under age 13 or have actual knowledge of

15   children under age 13 using their site can collect and use information about them. As a result of

16   COPPA, website operators must obtain "verifiable parental consent" from parents prior to the

17   collection and use of information about children under age 13. Meta has chosen to avoid these

18   obligations by purporting to ban all those younger than 13 through its terms of service.

19         46.     Meta states that children under the age of thirteen are prohibited from having Meta

20   accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta

21   has known that its age-verification protocols are largely inadequate, then estimating that it removes

22   20,000 children under age 13 from Facebook every day. The problem has not been remediated, as

23   Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated

24   that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

25         47.     Defendants do not charge their users to use their platforms, but instead receive money

26   from advertisers who pay a premium to target advertisements to specific categories of people as

27   studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon the total time

28

1    spent on the application, which directly correlates with the number of advertisements that can be

2    shown to each user.

3        48.    Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin

4    board, where content was published by authors. But Meta has evolved over time with the addition of

5    numerous features and products designed by Meta to engage users. The earliest of these—the search

6    function and the "like" button—were primarily user-controlled features. In more recent years,

7    however, Meta has taken a more active role in shaping the user-experience on the platform with more

8    complex features and products. The most visible of these are curated recommendations, which are

9    pushed to each user in a steady stream as the user navigates the website, and in notifications sent to

10   the user's smartphone and email addresses when the user is disengaged with the platform. These

11   proprietary Meta products include News Feed (a newsfeed of stories and posts published on the

12   platform, some of which are posted by your connections, and others that are suggested for you by

13   Meta), People You May Know (introductions to persons with common connections or background),

14   Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to

15   join). These curated and bundled recommendations are developed through sophisticated algorithms.

16   As distinguished from the earliest search functions that were used to navigate websites during the

17   Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs.

18   Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform)

19   and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical

20   designations), make assumptions about that user's interests and preferences, make predictions about

21   what else might appeal to the user, and then make very specific recommendations of posts and pages

22   to view and groups to visit and join based on rankings that will optimize Meta's key performance

23   indicators.

24       49.    Equipped with ample information about the risks of social media, the ineffectiveness

25   of its age-verification protocols, and the mental processes of teens, Meta has expended significant

26   effort to attract preteens to its products, including substantial investments in designing products that

27   would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity,

28

COMPLAINT
Case No.

so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50.    Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

51.    Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

[7] Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).



52.    The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.    Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

COMPLAINT
Case No.

stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54.     Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55.     The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of

---

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

COMPLAINT
Case No.

1    Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to

2    the cohort's mental health and the related frequency of suicidal ideation.

3         56.    Excessive screen time is harmful to adolescents' mental health, sleep patterns,

4    emotional well-being. Defendants' products lack any warnings that foreseeable product use can

5    disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage

6    exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous.

7    Reasonable and responsible parents are not able to accurately monitor their child's screen time

8    because most adolescents own or can obtain access to mobile devices and engage in social media use

9    outside their parents' presence.

10        57.    Meta professes to have implemented protective measures to counteract the well-

11   established dangers of its sites' customized, doggedly harmful content; however, its protocols apply

12   only to content conveyed in English and removes only three-to-five percent of harmful content. Meta

13   knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either

14   unwilling or incapable of properly managing its platforms. This is consistent with its established

15   pattern of recognizing, and subsequently ignoring, the needs of its underage users and its obligation

16   to create a suitable environment accessible only by its age-appropriate users, all in the interest of

17   reaping obscene profit.

18   **C.    Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as
       the Publisher or Speaker of Any Content Provided, Posted, or Created by Third**
19   **   Parties.**

20        58.    Plaintiff seeks to hold Defendants accountable for their own alleged acts and

21   omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of

22   dangerously defective social media products, not as the speaker or publisher of third-party content.

23        59.    Plaintiff alleges that Defendants failed to warn minor users and their parents of known

24   dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely

25   on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek

26   to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the

27   speech of others or for any attempts by Defendants to restrict access to objectionable content.

28

60.     Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

61.     None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.    PLAINTIFF-SPECIFIC ALLEGATIONS

62.     Plaintiff Autumn Seekford is a nineteen year old woman who has been a heavy user of the Meta platform(s).

63.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). Plaintiff's interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to Plaintiff 24 hours a day, Plaintiff began getting less and less sleep.

65.     As a proximate result of her addiction to the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to Plaintiff, initially a minor user of the Meta platform(s), Plaintiff subsequently developed injuries including, but not limited to, social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platforms(s) to allow minor users, as Plaintiff was, to become addicted to and abuse their products without the consent of the users' parents.

67.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to

COMPLAINT
Case No.

prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

68.     Plaintiff was not aware of the addictive and mentally harmful effects of the Meta platform(s) when Plaintiff began to use the products.

69.     Defendants not only failed to warn Plaintiff of the dangers of addiction, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

70.     As a result of Plaintiff's extensive and problematic use of the Meta platform(s), she has developed numerous mental health conditions that she still struggles with until this day.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### PRODUCTS LIABILITY - NEGLIGENT DESIGN

71.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

72.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

73.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

74.     Facebook and Instagram were designed and intended to be used as social media platforms.

75.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

76.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

77.     DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

78.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

79.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

80.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful

social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

81.     The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

82.     The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

83.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

84.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

85.     Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating

disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

86.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

87.     DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

88.     DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

      a.     Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

      b.     Default protective limits to length of use, frequency of use, or content types;

      c.     Opt-in restrictions to length of use, frequency of use, or content types;

      d.     session time limits;

      e.     Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

      f.     Session time notifications, warnings, or reports;

      g.     Warning of health effects of use and extended use upon sign-up;

      h.     Parental controls;

      i.     Self-limiting tools;

      j.     Implementing labels on images and videos that have been edited through the platform;

      k.     Age-based content filtering;

      l.     General content filtering;

m.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q.  Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r.  Chronological presentation of content rather than algorithmic;

s.  Many other less harmful alternatives.

89.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

90.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

91.     A reasonable company under the same or similar circumstances would have designed a safer product.

92.     Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep, among other harmful effects.

93.     The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

94.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT FAILURE TO WARN

95.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

96.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

97.     At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

98.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

99.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of

1  Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and

2  physical injuries as listed above.

3      100.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known

4  that Facebook and Instagram posed risks, including the risks of social media addiction, depression,

5  body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating

6  disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus,

7  ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other

8  harmful effects, as described herein, that were known and knowable in light of scientific and medical

9  knowledge that was generally accepted in the scientific community at the time of development,

10 dissemination, public release, and operation of the platforms.

11     101.    The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the

12 risks associated with the use of Facebook and Instagram.

13     102.    The DEFENDANTS breached their duty of care by failing to use reasonable care in

14 providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting

15 and advertising of the platforms including that, according to its own research:

16          a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the

17                platform;

18          b.    Sixty-six percent of teen girls and forty-six percent of teen boys have experienced

19                negative social comparisons on Instagram;

20          c.    Facebook makes body-image issues worse for one-third of girls;

21          d.    Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes

22                thoughts of suicide and self-injury worse;

23          e.    Seventeen percent of teen-girl Instagram users say the platform makes eating

24                issues worse;

25          f.    Instagram users are twice as likely to develop an eating disorder as those who

26                don't use social media.

27     103.    Facebook and Instagram are also defective for failing to warn users that:

28

a. Engagement-based ranking and intermittent variable rewards are:

    i. highly addictive,

    ii. promote harmful social comparison,

    iii. promote negative, controversial, and/or emotionally activating content,

    iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v. encourage bullying and conflict,

    vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

    i. inflict unrealistic and biased beauty standards upon users, and

    ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

104. The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a danger of

injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

105.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

106.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

107.    The failure of DEFENDANTS to adequately warn about its defective products—and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues—created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

108.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

109.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

110.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook and Instagram had she received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

COMPLAINT
Case No.

111.    Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

112.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION
### PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

113.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

114.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

115.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

116.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

117.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected, tested, and disseminated was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

118.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of

Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

119. Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

    a.   Failure to follow Good Manufacturing Practices ("GMPs");

    b.   Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.   Failure to adequately inspect/test Facebook and Instagram during the development process;

    d.   Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

    e.   Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

    f.   Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

    g.   Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

    h.   Failure to test the platforms' output to users given various user inputs;

    i.   Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

120. A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

121. Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

122. DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

123.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FOURTH CAUSE OF ACTION**
**NEGLIGENCE AND/OR GROSS NEGLIGENCE**

124.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

125.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

126.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

127.    Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

128.    DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

129.    DEFENDANTS knew, or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

130.    DEFENDANTS knew, or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

131.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

132.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

133.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

134.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

135.    DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and

(6) other features of the platform which are currently unknown and hidden from users and governments.

136.   DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

137.   DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

138.   DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

139.   DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

140.   DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in

repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

141.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

142.    DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

143.    The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

  a. Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

  b. Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

  c. Failure to take reasonable care in the design of Facebook and Instagram;

  d. Failure to use reasonable care in the production/development of Facebook and Instagram;

  e. Failure to use reasonable care in the operation of Facebook and Instagram;

  f. Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

  g. Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

  h. Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

  i. Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features;

and (6) other features of the platform which are currently unknown and hidden from users and governments;

j. Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k. Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l. Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m. Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n. Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

o. Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p. Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

COMPLAINT
Case No.

q.     Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r.     Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s.     Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t.     Failure to recall Facebook and Instagram;

u.     All other failures, acts and omissions set forth herein.

144.    DEFENDANTS' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

145.    DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

146.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

147.    Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

148.    Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep, which may cause or contribute to additional disease.

149.   DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

150.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

151.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

152.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

153.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

154.   DEFENDANTS were negligent, reckless and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

155.   DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

      a.    Facebook and Instagram were safe and were not harmful;

      b.    Long-term, frequent, prolonged use was harmless;

      c.    Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

d.  An inaccurate and misleading portrayal of the platforms mental and physical health impact;

156.  DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.  Facebook makes body-image issues worse for one-third of girls;

d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

157.  Meta also omitted to inform users that, as it knew or should have known:

a.  Engagement-based ranking and intermittent variable rewards are

    i.  highly addictive,

    ii.  promote harmful social comparison,

    iii.  promote negative, controversial, and/or emotionally activating content,

    iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v.   encourage bullying and conflict,

    vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

COMPLAINT
Case No.

      i.   inflict unrealistic and biased beauty standards upon users, and

      ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

   c.   The platforms cause the mental and physical health harms as listed above;

   d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

   e.   The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

   f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

158.   These representations were false and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

159.   DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

160.   Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

161.   DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

162.   DEFENDANTS intended for Plaintiff to rely on these representations.

163.    Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

164.    DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

165.    Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

166.    DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

167.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep, among other harms.

168.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SIXTH CAUSE OF ACTION**
**FRAUD**

169.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

170.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

COMPLAINT
Case No.

171.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

172.   DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[10] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

173.   DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

174.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

175.   DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

      a.    Facebook and Instagram were safe and were not harmful;

---

[10] https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

b.   Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

c.   Long-term, frequent, prolonged use was harmless;

d.   Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

e.   An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

f.   Other misrepresentations described herein.

176.   DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

g.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

h.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

i.   Facebook makes body-image issues worse for one-third of girls;

j.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

k.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

l.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

177.   Meta also omitted/failed to inform users that, as it knew or should have known:

m.   Engagement-based ranking and intermittent variable rewards are:

i.   highly addictive,

ii.   promote harmful social comparison,

iii.   promote negative, controversial, and/or emotionally activating content,

iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

v.   encourage bullying and conflict,

       vi.     can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

       vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

n.   Face tracking and augmentation (image and video filters):

       i.      inflict unrealistic and biased beauty standards upon users, and

       ii.     cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

o.   The platforms cause the mental and physical health harms as listed above;

p.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

q.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

178.   These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

179.   The above representations were communicated to Plaintiff.

180.   Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

181.   DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive

1  reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would

2  have found it material to their purchasing decisions that the platforms' products posed unreasonable

3  risks of substantial mental and bodily injury, including addiction resulting from the use of the

4  products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to

5  purchase and consume Facebook and Instagram.

6       182.    DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known

7  and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of

8  the facts; because the facts would be material to reasonable consumers; because the platforms pose

9  an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial

10 representations concerning the same subject matter as the omitted facts.

11      183.    Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions.

12 Reasonable consumers would have been expected to have relied on the platforms' misrepresentations

13 and omissions.

14      184.    DEFENDANTS knew or should have known that its misrepresentations and/or

15 omissions were false and misleading, and intended for consumers to rely on such misrepresentations

16 and omissions.

17      185.    DEFENDANTS' misrepresentations and/or omissions were a substantial factor in

18 causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS'

19 fraudulent conduct as described herein.

20      186.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and

21 punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to

22 allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of

23 suit, attorneys' fees, and all such other relief as the Court deems proper.

24

25

26

27

28

## SEVENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

187.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

188.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

189.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

190.    DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

191.    DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

192.    DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features.  DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

193.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

194.   DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

195.   DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

196.   DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

197.   DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

198.   DEFENDANTS concealed from Plaintiff that, according to its own research:

    a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.   Facebook makes body-image issues worse for one-third of girls;

    d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

199.   DEFENDANTS also concealed from Plaintiff that:

    a.   Engagement-based ranking and intermittent variable rewards are:

        i.       highly addictive,

        ii.     promote harmful social comparison,

        iii.    promote negative, controversial, and/or emotionally activating content,

        iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.     encourage bullying and conflict,

        vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

   b.   Face tracking and augmentation (image and video filters):

        i.       inflict unrealistic and biased beauty standards upon users, and

        ii.     cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

   c.   The platforms cause the mental and physical health harms as listed above;

   d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

   e.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

   f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

200.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

201.    Plaintiff did not know of the facts that DEFENDANTS concealed.

202.    DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

203.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

204.    DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

205.    Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook and Instagram.

206.    DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

207.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

208.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**EIGHTH CAUSE OF ACTION**
**CONSPIRACY TO COMMIT FRAUD**

209.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

COMPLAINT
Case No.

210.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of the State of Virginia.

211.    DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

212.    DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

213.    Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

214.    DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

215.    Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

216.    DEFENDANTS' conspiracy involved:

    a.    Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

    b.    Suppressing internal and external efforts to research the harmful effects of those platforms;

    c.    Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

    d.    Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

    e.    Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

217.    DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

218.    DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

219.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
## UNJUST ENRICHMENT

220.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

221.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

222.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

223.    DEFENDANTS concealed from Plaintiff that, according to its own research:

a.     At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.     Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.     Facebook makes body-image issues worse for one-third of girls;

d.     Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.     Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.     Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

224.     DEFENDANTS also concealed from Plaintiff that:

g.     Engagement-based ranking and intermittent variable rewards are:

    i.     highly addictive,

    ii.     promote harmful social comparison,

    iii.     promote negative, controversial, and/or emotionally activating content,

    iv.     promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v.     encourage bullying and conflict,

    vi.     can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii.     present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

h.     Face tracking and augmentation (image and video filters):

    i.     inflict unrealistic and biased beauty standards upon users, and

    ii.     cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

i.     The platforms cause the mental and physical health harms as listed above;

    j.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    k.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    l.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

225. DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

226. DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

227. The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

228. There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

229. DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

230. Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and

the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

231.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## VIOLATION OF UNFAIR TRADE
## PRACTICES/CONSUMER PROTECTION LAWS

232.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

233.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

234.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

235.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

236.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

237.    Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

238. Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

239. Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

      a. Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

      b. Advertising goods or service with the intent not to sell them as advertised;

      c. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

      d. Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

      e. Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

240. Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

241. DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

      a. VA. CODE ANN. § 59.1-196 *et seq.* (Virginia Consumer Protection Act of 1977).

242. Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of

1   DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in

2   advance of this filing and failed to take any action to cure their actions or omissions.

3       243.   Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations

4   and omissions in deciding to use Facebook and Instagram.

5       244.   By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as

6   a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and

7   are entitled to statutory and compensatory damages in an amount to be proven at trial.

8       245.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and

9   punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to

10  allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of

11  suit, attorneys' fees, and all such other relief as the Court deems proper.

12
13
**ELEVENTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**

14      246.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though

15  set forth fully at length herein.

16      247.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant

17  to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident

18  State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts,

19  statutes, and laws of the State of Virginia.

20      248.   At all relevant times, DEFENDANTS designed, developed, managed, operated,

21  inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

22  and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid

23  causing harm to those that used it, such as Plaintiff.

24      249.   DEFENDANTS violated state law for breach of express warranties and Plaintiff herein

25  will bring a cause of action for breach of express warranty under applicable State common law.

26      250.   Upon information and belief, DEFENDANTS expressly warranted through public

27  statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or

28
COMPLAINT
Case No.

browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

251.    Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

252.    These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

253.    As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

254.    These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

255.    When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

256.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

257.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

258.   DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

259.   As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

260.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**TWELFTH CAUSE OF ACTION**
**BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY**

261.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

262.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

263.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

264.   DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

265.   Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

266.    The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

267.    The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

268.    Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

269.    DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

270.    Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

271.    Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

272.    Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

273.    Plaintiff would not have used Facebook and Instagram, or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

274.    DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

275.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

276.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**THIRTEENTH CAUSE OF ACTION**
**FITNESS FOR A PARTICULAR PURPOSE**

277.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

278.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

279.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

280.    DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

281.    Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

282.    DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its

1  websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or
2  browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense
3  of community, and emotional connectedness with others.

4  283.  DEFENDANTS knew at that time of account registration, and/or had reason to know,
5  that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social
6  media platforms.

7  284.  DEFENDANTS did not effectively exclude or modify this implied warranty at any
8  point during users' registration and interface with the platforms.

9  285.  As described herein, DEFENDANTS breached this implied warranty because the
10 platforms use features that cause social media addiction, depression, body dysmorphia, anxiety,
11 suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa,
12 bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping,
13 fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or
14 contribute to additional disease.

15 286.  DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram
16 and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

17 287.  DEFENDANTS authored the documents and/or made the statements upon which these
18 warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook
19 and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises,
20 descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit
21 for the particular purposes for which they were intended.

22 288.  All of the aforementioned written or electronic materials are known to
23 DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be
24 produced by DEFENDANTS and made part of the record once discovery is completed.

25 289.  DEFENDANTS' breach of these implied warranties were a substantial factor in
26 causing Plaintiff's harms.

27
28

COMPLAINT
Case No.

290.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

291.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

292.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

293.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

294.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

295.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

296.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

297.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

298.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of

COMPLAINT
Case No.

Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

299.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

300.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

301.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

302.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

303.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

304.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

305.     DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

306.     Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

307.     Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

308.     DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

309.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FIFTEENTH CAUSE OF ACTION**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

310.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

311.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

312.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

313.   DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

314.   DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

315.   DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

316.   DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

317.   DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD,

difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

318.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

319.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

320.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

321.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

322.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

323.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

324.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young

adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

325.    Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

326.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL/RETROFIT

327.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

328.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

329.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

330.   DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

331.   DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

332.   DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

333.   Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

334.   Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

335.   As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

336.   Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

337.   However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

338.     Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

339.     In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

340.     Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

341.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
### MEDICAL MONITORING

342.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

343.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

344.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

COMPLAINT
Case No.

345.    Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

346.    According to Meta's internal research:

    a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.   Facebook makes body-image issues worse for one-third of girls;

    d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

347.    Facebook and Instagram cause harm by the following product effects:

    a.   Engagement-based ranking and intermittent variable rewards are:

        i.   highly addictive,

        ii.   promote harmful social comparison,

        iii.   promote negative, controversial, and/or emotionally activating content,

        iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.   encourage bullying and conflict,

        vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

    i. inflict unrealistic and biased beauty standards upon users, and

    ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

348. Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

349. The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

350. The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also

1  promote controversial, disturbing, negative, and/or emotionally charged content causing harm to

2  users.

3        351.   The combined result of these features is to present to users a false reality—it presents

4  to users a world which is constantly controversial and negative; where most other people are

5  exceedingly more attractive than the user; where most other people are exceedingly more successful

6  and/or competent than the user; and which will facilitate and encourage harmful behaviors such as

7  self-harm and eating disorders.

8        352.   These features take advantage of biological systems, human behavior, and psychology,

9  to addict and condition users to engage in repetitive content-consuming actions such as scrolling,

10  "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input

11  and behavior are tracked to allow the platform to automatically tune itself to each individual user to

12  become as addictive and difficult to stop engaging with as possible.

13        353.   Potential health harms from these features include, among other types of harm, social

14  media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-

15  harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating

16  disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye

17  strain, among other harmful effects.

18        354.   As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed

19  mental and physical health issues that will require life-long monitoring treatment.

20        355.   As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a

21  significantly increased risk of developing a serious latent disease and/or injury, suffering further

22  injury at an unknown date in the future. Such injuries include the development and/or exacerbation

23  of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm,

24  thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide,

25  death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines,

26  loss of vision, eye strain, among other harmful effects.

27

28

356.    Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

357.    For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

358.    These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

359.    Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

360.    Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

1     361.   Such other relief as the Court deems proper.

2          **VII.   TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS**

3     362.   Through the exercise of reasonable diligence, Plaintiff did not and could not have

4     discovered that Facebook and Instagram caused her injuries and/or sequelae thereto because, at the

5     time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

6     363.   Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused

7     her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing

8     of this action.

9     364.   In addition, DEFENDANTS' fraudulent concealment has tolled the running of any

10    statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS

11    actively concealed from Plaintiff the risks associated with the defects of Facebook and Instagram and

12    that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative

13    misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

14    365.   As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and

15    could not have reasonably known or learned through reasonable diligence that she had been exposed

16    to the defects and risks alleged herein and that those defects and risks were the direct and proximate

17    result of DEFENDANTS' acts and omissions.

18          **VIII.   DEMAND FOR A JURY TRIAL**

19    Plaintiff hereby demands a trial by jury.

20          **IX.   PRAYER FOR RELIEF**

21    Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but

22    not limited to:

23    1.     Entering judgment for Plaintiff and against DEFENDANTS;

24    2.     Entering an Order that Defendants are jointly and severally liable;

25    3.     Damages to compensate Plaintiff for injuries sustained as a result of the use of the

26    platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment

27

28

of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.    Awarding actual and compensatory damages;

5.    Awarding statutory damages in the maximum amount permitted by law;

6.    Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7.    Awarding reasonable attorneys' fees;

8.    Awarding experts' fees;

9.    Awarding costs of litigation;

10.    Awarding pre-judgment and post-judgment interest at the lawful rate;

11.    A trial by jury on all issues of the case;

12.    Awarding medical monitoring costs or programs; and

13.    Any other relief as this court may deem equitable and just, or that may be available.

DATED:  June 30, 2022              Respectfully Submitted,

*/s/ Dena C. Sharp*

**GIRARD SHARP LLP**
Dena C. Sharp (SBN 245869)
Adam E. Polk (SBN 273000)
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Email: dsharp@girardsharp.com
Email: apolk@girardsharp.com

Andy D. Birchfield, Jr. (*pro hac vice*)*
Jennifer K. Emmel (*pro hac vice*)*
Joseph G. VanZandt (*pro hac vice*)*
Clinton Richardson (*pro hac vice*)*
Seth Harding (*pro hac vice*)*
**BEASLEY ALLEN CROW**
**METHVIN PORTIS & MILES, LLC**
234 Commerce Street
Montgomery, AL 36103

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Tel:  334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com
Seth.Harding@BeasleyAllen.com

***Attorneys for Plaintiff***

**\*pro hac vice applications forthcoming**

COMPLAINT
Case No.